The order of confirmation submitted by the Debtors and endorsed by the Trustee will be entered.

**Donald DERRINGTON, et al., Plaintiffs,**

**v.**

**UNITED STATES of America, Defendant.**

No. C02–5257L.

United States District Court, W.D. Washington, at Seattle.

Sept. 12, 2003.

John Mark Colvin, Scott A. Schumacher, Chicoine & Hallett, PS, Seattle, WA, for Plaintiff.

Diane E. Tebelius, Seattle, WA, W. Carl Hankla, Washington, DC, for Defendant.

## ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

LASNIK, District Judge.

## I. INTRODUCTION

This matter comes before the Court on a motion for summary judgment (Dkt. # 15) filed by defendant United States of America ("the IRS"). The IRS seeks dismissal of claims for a refund filed by plaintiffs Donald Derrington, *et al.* (collectively, "Plaintiffs"). The Court grants the IRS's motion for the reasons set forth in this Order.

## II. DISCUSSION

### A. Background.

This suit centers upon the ownership of approximately $235,000 seized in 2000 by the IRS to collect income taxes, interest and penalties owed by G. Sloan Smith ("Smith"). The funds levied by the IRS were payable to Smith or his nominee, Plains Group Ltd. ("Plains Group"), due to claims Smith obtained against a bankruptcy estate with funds supplied by Plaintiffs. Plaintiffs argue that they owned the claims from which the funds were derived. The IRS contends that Smith acquired the claims with money loaned to him by Plaintiffs and therefore the IRS's liens against the claims trumps any interest Plaintiffs may have had in the claims. Discussion of a fairly complex set of transactions is necessary for resolution of this issue.

In the early 1990s, the IRS assessed Smith with federal income tax liabilities arising from his failure to pay taxes owed for several years. (Bedford Decl. ¶ 3). Pursuant to 26 U.S.C. § 6321, statutory liens arose against Smith's property and rights to property for the tax liabilities. *Id.* ¶ 4. In November of 1993, the IRS recorded nominee liens against Plains Group. *Id.* ¶ 5; *see also* Bedford Decl. Exs. A–B (notices of federal tax lien).

In 1991, Wallace and Clarice Hall ("the Halls") and their entities entered bankruptcy proceedings in *In re Wallace and Clarice Hall*, Bankr.No. 91–09143, United States Bankruptcy Court, Western District of Washington. (Hankla Decl. Ex. A (Derrington Decl.) ¶ 2). The Halls held a fifty percent interest in the Mariner Village Mobile Home Park in Everett, Washington. *Id.*

Plaintiffs learned of an investment opportunity involving the Halls' bankruptcy through John Widmer, a mutual friend of Plaintiffs and the Halls. *Id.* ¶ 7. The plan

called for Plaintiffs, along with other investors, to purchase the unsecured claims against the Halls' estate, seek to have the bankruptcy case dismissed, and then recoup the principal investment plus points and interest with income generated by the Halls' interest in Mariner Village. *Id.* ¶¶ 5, 12. Plaintiffs initially planned to use an individual named Tim Golden ("Golden") to raise the funds and implement the investment plan. *Id.* ¶ 5. Golden gave a presentation to Plaintiffs in which he used a term sheet that described a one-year loan to an unspecified borrower. *Id.* Ex. 2. The plan called for Plaintiffs to earn a thirty-three percent return on their investment: a fifteen percentage point origination fee and eighteen percent interest. *Id.*

Golden was unable to complete the deal. *Id.* ¶ 2. However, in April of 1994, the Plaintiffs met with Smith and the parties finalized a deal that was similar to that proposed by Golden. *Id.* ¶ 12. Plaintiff Donald Derrington described the plan as follows:

> The deal with Plains Group was to be the same as the deal with Golden, that is, we were putting up half the money, that Sloan Smith or some other investor would be going in on the rest of the transaction, and that our investment was to be secured by Hall's 50% ownership in the Mariner Village manufactured home park. The thrust was also to get the bankruptcy dismissed, but that our investment was to be secured by Hall's 50% ownership of the Mariner Village manufactured home park. We were also going to receive a 15% loan fee and 18%

> interest. If the Halls ended up with Mariner Village, we were going to be paid out over time. If the Halls did not end up with Mariner Village, we would have the security of the funds to be paid out on the bankruptcy claims from the funds in the hands of the Hall bankruptcy trustee.

> The net result was that among the investors we put $325,000, which we paid to Sloan Smith or Plains Group Ltd. about April 21, 1994.

*Id.* ¶¶ 12–13.

Plaintiffs and Smith signed a document entitled "Agreement to Consolidate Loans and Negotiate Settlement" (the "Agreement"). *Id.* Ex. 3. The Agreement appears to have contemplated that the investors would loan funds directly to the Halls and that the Halls would use the proceeds to settle the claims against them.[1] *See id.* at ¶ 4 ("All funds loaned to the Halls by the undersigned lenders shall be subject to the terms of a loan agreement between the Halls and the undersigned lenders and shall be secured by the Halls [sic] 50% ownership in Mariner Village Mobile Home Park."). However, the Halls did not sign the Agreement.[2]

On April 21, 1994, Plaintiffs deposited funds into a Plains Group bank account. *Id.* ¶ 13. Smith then used the funds to purchase claims against the Halls' bankruptcy estate. (Hankla Decl. Ex. C (Derrington Dep.) at 44). Derrington accompanied Smith while he negotiated the claim purchases. *Id.* The claims appear to have

[1]. Plaintiffs state that "at least on paper, the investors actually entered into an agreement with the Halls in which the investors would loan money to the Halls and the Halls agreed to pay points and interest." (Response at 4). However, Plaintiffs admit that this was not "the deal contemplated by the investors." *Id.* at 5.

[2]. Additionally, it is unlikely that the Halls could have used such loan proceeds to pay off creditors because at the time the Agreement was signed the Halls were in bankruptcy proceedings.

been acquired in the name of the Plains Group. (Hankla Decl. Ex. A ¶ 19).

Smith did not acquire all of the creditors' claims and the bankruptcy trustee remained in control of the estate. *Id.* ¶¶ 16–17. The Halls' fifty percent interest in Mariner Village was sold through the bankruptcy proceeding, and the investors were therefore limited to the claims for repayment of the investment. *Id.* On November 2, 1994, unbeknownst to Plaintiffs, the bankruptcy trustee made an interim distribution on the claims acquired by the Plains Group in the amount of $373,848. *Id.* ¶ 22. The check distributing these funds was payable to Sloan Smith. (Hankla Decl. Ex. D).

Smith did not inform Plaintiffs that he had received this distribution. (Hankla Decl. Ex. A ¶ 22). Plaintiffs later learned of the distribution from bankruptcy court records and demanded an accounting from Smith. *Id.* ¶ 27. Smith informed Plaintiffs that he had reinvested the funds in other ventures. *Id.* Shortly thereafter Plaintiffs hired an attorney and initiated a lawsuit against Smith in the United States District Court for the District of Oregon. In deposition testimony taken in that litigation the Plaintiffs characterized the transaction as a loan to Smith or the Plains Group. *See* Hankla Decl. Ex. C (Derrington Dep.) at 46 (testifying that he though he was loaning money to Sloan Smith); Hankla Decl. Ex. B (Nortman Dep.) at 18–19 (testifying that he thought he was loaning money to Smith or the Plains Group); Hankla Decl. Ex. F (Halver Dep.) at 18 (testifying that he thought he was loaning money to the Plains Group). Plaintiffs obtained a judgment against Smith and the Plains Group by default. (Second Hankla Decl. Ex. F).

After the $373,848 distribution, approximately $235,000 remained due from the Halls' bankruptcy estate on the Plains Group claims. (Hankla Decl. Ex. I). Plaintiffs sued the bankruptcy trustee in an effort to prevent distribution of the remaining amount to Smith. *Id.* Prior to issuance of the default judgment against Smith in the Oregon litigation, Plaintiffs and the bankruptcy trustee reached an agreement whereby the trustee would deposit the remaining amount into Plaintiffs' attorney's trust account pending resolution of the Oregon litigation. *Id.* However, before the bankruptcy trustee transferred the funds to the trust account, the IRS issued a notice of levy to the trustee commanding him to pay the Plains Group property to the IRS for taxes owed by Smith. (Bedford Decl. Ex. C). Plaintiffs and the IRS negotiated for several months regarding whether the IRS might release the levy and pursue its tax claim in the Oregon litigation. (Hankla Decl. Ex. I). Plaintiffs and the IRS were unable to reach an agreement, and Plaintiffs initiated a wrongful levy action against the IRS in this Court. (Hankla Decl. Ex. L). On June 14, 2000, the Court dismissed that action as time-barred. (Hankla Decl. Ex. T).

In September of 2000 the IRS obtained the levied funds, amounting to $239,498.29. The levied funds paid all of Smith's outstanding tax liabilities with the exception of approximately $3,000 due for 1990. (Bedford Decl. ¶ 8). In April of 2001, Plaintiffs filed administrative claims with the IRS in an attempt to recover the money seized by the IRS. (Colvin Decl. Ex. L). The IRS denied Plaintiffs' claims. (Colvin Decl. Ex. M). Plaintiffs initiated this lawsuit on May 22, 2002.

## B. Summary Judgment Standard.

Summary judgment is proper if the moving party shows that "there is no genuine issue as to any material fact and that

[it] is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

Once a defendant who is seeking summary judgment has demonstrated the absence of a genuine issue of fact as to one or more of the essential elements of the plaintiff's claims, the plaintiff must make an affirmative showing on all matters placed at issue by the motion as to which the plaintiff has the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In such a situation Fed.R.Civ.P. 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56(e)); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.").

## C. Ownership of the Claims Against the Hall Bankruptcy Estate.

■ All parties agree that the ownership of the claims against the Hall bankruptcy estate is the key issue in this litigation. *See* Motion at 12 ("The instant refund suit turns on a property question: who owned the Plains Group claims against the Hall bankruptcy estate, Smith or plaintiffs? If Smith owned the claims, then the government's liens for taxes attached to them, the levy was proper, and this suit must be dismissed."); Response at 13 ("[T]he only issue in this case is who is ·the rightful owner of the funds levied upon by the IRS from the Halls' bankruptcy estate? If Smith owned the

claims, then the Government's liens attached to that property and the levy was proper."). When levying funds "the IRS 'steps into the taxpayer's shoes' ... [and] acquires whatever rights the taxpayer himself possesses." *United States v. National Bank of Commerce*, 472 U.S. 713, 725, 105 S.Ct. 2919, 86 L.Ed.2d 565 (1985) (internal citation omitted). "[S]tate law controls in determining the nature of the legal interest which the taxpayer had in the property." *Id.* at 722, 105 S.Ct. 2919. Therefore, if under state law Smith owned the claims, the IRS properly stepped into Smith's shoes when it levied the funds payable for the claims.

■ In support of its argument that Smith owned the claims, the IRS cites the above-quoted deposition testimony given by Plaintiffs in the Oregon litigation in which each of the Plaintiffs testified that the transaction involved a loan to Smith or the Plains Group. Additionally, the IRS cites a letter plaintiff Nortman wrote to Smith regarding the "Loan to Plains Group Ltd/Plains Mgmt Ltd/Sloan Smith" in which Nortman discussed payment of all "principle [sic]/points/interest" due to the investors. (Hankla Decl. Ex. A. Ex. 5). Additionally, when the Halls sued the bankruptcy trustee, Plaintiffs' prior attorney wrote a letter to the Halls' attorney threatening Rule 11 sanctions. (Hankla Decl. Ex. J). In that letter Plaintiffs' attorney stated that his clients had "lent money to Plains Group." *Id.*

The IRS also notes that once it became apparent that if the investment constituted a loan to Smith or the Plains Group, Plaintiffs would not recover the funds levied the by IRS, Plaintiffs' prior attorney advised them not to refer to the transaction as a loan. For example, Plaintiffs' prior attorney advised his clients "never to say anything that undercuts our position that you owned and own the claim." (Hankla Decl.

Ex. N). Plaintiffs' prior attorney also stated in a letter to Plaintiffs that if Plaintiffs ultimately were considered lenders to Smith or Plains Group, they could "[k]iss the $235,000 in Seattle goodbye." (Hankla Decl. Ex. O).

Plaintiffs argue that their prior testimony that the transaction constituted a loan to Smith or the Plains Group should be disregarded because they were inexperienced investors. *See* Response at 14 ("To an unsavvy investor, such as the Plaintiffs, an advance of money to an agent for him to purchase bankruptcy claims for the Plaintiffs may have the feel or color of a 'loan;' however, this is clearly not a 'loan' in the legal sense."). Additionally, Plaintiffs attempt to explain their prior testimony by stating that reference to " 'loaning' the investment funds to Smith ... was their short-hand way of describing the investment they made *through* Smith." *Id.* at 15 (emphasis in original) (citing Derrington Decl. Ex. D; Nortman Decl. Ex. C; Colvin Decl. Ex. O). Finally, Plaintiffs submit a purported transcript of a telephone conversation in which Plaintiffs contend that Smith stated that the transaction did not constitute a loan to him.[3] *See* Colvin Decl. Ex. F at 6.

Having considered the evidence in the light most favorable to Plaintiffs, the Court finds that the transaction constituted a loan by Plaintiffs to Smith or the Plains Group. Not only is this demonstrated by Plaintiffs' prior testimony, but examination of the terms of the agreement, admitted by all parties, shows that Plaintiffs loaned the funds to Smith or the Plains Group and did not own the claims in the Hall bankruptcy estate. For example, Plaintiffs admit that the terms of the investment called for a thirty-three percent return on investment: a fifteen percentage point origination fee and eighteen percent in interest. *See, e.g.,* Hankla Decl. Ex. A (Derrington Decl.) Ex. 2 (original terms sheet); Hankla Decl. Ex. A (Derrington stating that "[w]e were also going to receive a 15% loan fee and 18% interest"). Plaintiffs maintained that this was their expected return even after they denied the transaction was a loan. *See, e.g.,* Hankla Decl. Ex. R (March 30, 2000 Nortman Dep.) at 19 (testifying that the agreement with Smith called for a return composed of a fifteen point fee and eighteen percent interest). The undisputed terms of the investment demonstrate that Plaintiffs did not contemplate an equity investment, in which they would assume the risk that the claims would not cover the funds they advanced (or the chance that the claims would be worth more than their principal and expected return). Furthermore, Plaintiffs' recent redefinition of the transaction as an "investment," rather than a "loan," does not support Plaintiffs' position. A loan is a particular kind of investment; the most common is known as a "bond."

The evidence before the Court demonstrates that Plaintiffs' investment constituted a purchase money loan to Mr. Smith.

---

**3.** Because the statement is made by a person other than the declarant to prove the truth of the matter asserted, the transcript constitutes inadmissable hearsay evidence. Fed.R.Evid. 801, 802. A party may not defeat a motion for summary judgment on the basis of inadmissible hearsay evidence. *Orr v. Bank of America, NT & SA,* 285 F.3d 764, 783 (9th Cir.2002). Additionally, even if this transcript did not constitute inadmissible hearsay evidence, it would not likely assist Plaintiffs because Smith appeared to be speculating regarding what Hall's attorneys would consider the transaction to be based upon the written agreement. *See* Colvin Decl. Ex. F at 6 ("I mean she faxed all the stuff down to her attorney's [sic] yesterday and those guys got it all and they're saying what the hell is this? This loan was made to Clarise [Hall], this wasn't made to Sloan Smith. Sloan Smith is the facilitator, he's the guy who's managing it. There's no loan to Sloan Smith.").

Plaintiffs did not own the claims levied by the IRS.

## D. Constructive Trust.

Plaintiffs contend that even if the Court determines that they did not own the claims, the Court should find that a constructive trust in their favor arose prior to the time the IRS liens attached to the property. (Response at 16–18). In support of this argument Plaintiffs cite *F.T.C. v. Crittenden*, 823 F.Supp. 699 (C.D.Cal. 1993). Relying upon California law that a constructive trust may exist if a court finds "merely that the acquisition of property was wrongful and that the keeping of the property ... would constitute unjust enrichment," the *Crittenden* Court imposed a constructive trust retroactively to prime a federal tax lien. *Crittenden*, 823 F.Supp. at 703. Because the funds were wrongfully taken from consumers when the taxpayer secretly overcharged them, by virtue of the constructive trust "the funds ... belong[ed] to Crittenden's injured customers, and not to Crittenden." *Id.*

 In Washington "[a] constructive trust arises where a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it." *Baker v. Leonard,*

120 Wash.2d 538, 547–48, 843 P.2d 1050 (1993). Here, in contrast to *Crittenden*[4], assuming that a constructive trust arose on Plaintiffs' behalf, such a trust could not have been formed prior to the time the IRS liens attached to the property. The parties do not dispute that Plaintiffs intended Smith and the Plains Group to utilize Plaintiffs' funds to acquire the creditors' claims. Smith could not have breached his duty to convey the proceeds of those claims to Plaintiffs until he failed to transfer to Plaintiffs the $373,848 interim distribution on November 2, 1994.[5] Because the IRS liens attached to the claims when they were purchased by Smith / the Plains Group, any constructive trust on Plaintiffs' behalf would have been inchoate when the tax liens attached and therefore would not prime the liens. *Blachy v. Butcher,* 221 F.3d 896, 906 (6th Cir.2000).

## III. CONCLUSION

For the foregoing reasons, the Court GRANTS the IRS's motion for summary judgment (Dkt.# 15). The Clerk of the Court is directed to enter judgment in favor of the IRS and against Plaintiffs. The Clerk of the Court is also directed to send copies of this Order to all counsel of record.

---

**4.** In *Crittenden* the constructive trust arose at the time the taxpayer secretly overcharged the customers.

**5.** Plaintiffs contend that "a constructive trust arose when Smith wrongfully purchased the claims in the name of Plains Management, Ltd. (not the Plains Group) for his own purposes, and intended to keep the proceeds for himself." (Response at 17). However, the parties do not dispute that Smith acquired the claims through the Plains Group, subsequently transferred them to Plains Management, and finally transferred them back to the Plains Group. *See, e.g.,* Hankla Decl. Ex. A ¶¶ 14, 19 (Smith and Derrington acquired claims from funds in "Plains Group Ltd."

account and "another entity called Plains Management was assigned the claims"); Hankla Decl. Ex. L (wrongful levy complaint) ¶ 15 ("Eventually, Smith caused Plains Group Ltd. to assign the claims to defendant Plains Management (USA) Ltd., or Plains Management Ltd. Thereafter, Smith caused Plains Management (USA) Ltd., or Plains Management Ltd. to reassign the claims to Plains Group Ltd."). Even if a constructive trust arose when the claims were assigned from the Plains Group to Plains Management, the trust would have been inchoate when the tax liens attached and therefore would not prime the IRS liens. *Blachy v. Butcher,* 221 F.3d 896, 906 (6th Cir.2000).

JUDGMENT IN A CIVIL CASE

_ Jury Verdict. This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

x Decision by Court. This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS ORDERED AND ADJUDGED:

The Court grants the IRS's motion for summary judgment.